THE FIRST NATIONAL CORPORATION OF PORTLAND, A CORPORATION, PETITIONER, ET AL.,[1] *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

Docket Nos. 108224, 108305, 108367, 108306 109642–109645.
Promulgated August 12, 1943.

*George H. Koster, Esq.,* for the petitioners.
*Thomas M. Mather, Esq.,* for the respondent.

---

[1] Proceedings of the following petitioners are consolidated herewith. Transamerica Corporation, a corporation, (Transferee of The First National Corporation of Portland); Occidental Life Insurance Co., a corporation (Transferee of The First National Corporation of Portland); Western States Corporation, a corporation, (Transferee of The First National Corporation of Portland).

554

OPINION.

*Issue I.*

MELLOTT, *Judge:* Petitioner contends that the transaction involving the liquidation of the four banks was not closed and completed until December 31, 1937; that not until then could it determine how much it would receive upon its investment in the stock of the four banks: that therefore it could not earlier determine whether it would sustain a loss or the amount thereof; and that its loss, measured by the difference between the aggregate of its investment in the stock and the aggregate of its recovery, was actually sustained in the year 1937. It also contends that the $25,049.54 was a return of capital and hence could not be income either in the year 1937 or in the year 1938. The portion of the notice of deficiency set out above is a fair synopsis of respondent's contentions.

Briefly reviewing the facts, petitioner for several years prior to 1933 owned all of the stock of four small banks. It also owned a substantial part of the stock of the First Bank and it and its parent collectively owned the majority of the First Bank's stock. All of the banks in the country had been closed during the banking holiday and were about to reopen. Oregon had enacted legislation permitting branch banking and the chief competitor of this particular group of banks in Portland announced that it would branch all of its banks upon reopening. The First Bank desired to acquire the four banks for the purpose of operating them as branches. Petitioner and its parent were willing to have it do so. Accordingly petitioner, as the sole stockholder of the four banks on April 2. 1933. entered into an oral agreement with the officers of the First Bank under which the properties of the four banks were turned over to it and the businesses were opened by the First Bank on April 3, 1933. as branches.

After the transfer of the four banks to First Bank petitioner's officers and the officers of First Bank carried on certain negotiations with reference to the price to be paid. These negotiations culminated in the execution of five contracts on April 18. 1933. all of which were executed contemporaneously. A separate contract was executed by each of the four banks under which it transferred title to all of its assets to the First Bank in consideration of the payment in cash of an amount equal to the fair market value of the assets transferred. The aggregate amount paid under these four contracts was $364,558.70. This amount was less than petitioner's investment in the four banks. The First Bank and petitioner therefore entered into another contract, hereinafter sometimes referred to as the fifth contract. under which the First Bank agreed to pay additional amounts to it, which

could not, however, exceed the difference between the cash already received and petitioner's investment in the four banks. The payments specified were to be based upon the profits realized each year by the First Bank from the operation of the properties as branches until December 31, 1937. and were also to include all recoveries prior to December 31, 1935, upon assets charged off upon the books of the four banks.

Under the fifth contract petitioner received the sum of $20.215.38 in 1933. The aggregate amount received by it during 1933 was therefore $384.774.08. In the years 1934 to 1938, inclusive, additional amounts aggregating $76.905.69 were received. The last payment. in the amount of $24.628.97, represented the branch profits derived during the period specified in the contract. It was actually paid over to petitioner in February 1938; but a reasonably close approximation of the amount to be received had been made by petitioner in 1937 and accrued by it upon its books.

After April 18, 1933, the four banks had no assets and in 1935 they were all formally dissolved. In the returns of the four banks for 1933. included as a part of the consolidated income tax return of Transamerica and its subsidiaries, it was stated that the four banks had gone into voluntary liquidation, had sold all of their assets for cash. and that the liquidating dividends had been paid to petitioner.

Transamerica filed consolidated income tax returns for the years 1931 to 1933. inclusive. and the incomes of petitioner. the First Bank, and the four banks were included therein. None of the amount received by petitioner under the five contracts was included in gross income for 1933 and no deduction was claimed by it for any loss on the liquidation of the four banks. The amounts received in the later years were shown in the returns as nontaxable and, with the exception of the $25,049.54 received in 1937 and 1938 and presently in issue, no adjustment was made by respondent.

In its income tax return for 1937 petitioner claimed a capital loss of $137,765.47, this amount being the difference between its investment in the stock of the four banks and the aggregate amount received. The claimed deduction was disallowed. If any capital loss may be allowed the amount is now stipulated to be $121.472. The Commissioner included in gross income the amounts received (or accrued) under the fifth contract during the taxable years, aggregating $25.049.54.

We agree with the respondent that any loss sustained on liquidation in 1933 of the four banking corporations was not an allowable deduction on the consolidated return of Transamerica and its affiliates for that year. if a liquidation were then actually made; for any such liquidation would clearly have been an intercompany trans-

action.[1]  Petitioner's contentions will be discussed in more detail later.  It suffices to state at this juncture that petitioner contends the liquidation of the four banks was not completed until 1937. Whether the fifth contract resulted from an arm's length transaction between independent corporate entities does not seem to be particularly important and is not discussed by the respondent at any length upon brief.  The evidence indicates, however, that the officers of petitioner were conscious of their responsibility to its preferred stockholders and the record is devoid of any indication that they were guilty of any act approximating bad faith toward them.

The other contentions of the respondent elaborated upon in his brief, are that the liquidation was completed in 1933 when petitioner received cash and a contract under which additional payments were to be made; that the contract was either wholly without consideration or was given only for the good will of the four banks, which is not shown to have had any basis in their. or petitioner's hands; and that the payments made under it "constitute profit in full as realized."

The form in which petitioner and the First Bank chose to clothe the transaction invites this argument.  Nevertheless we think the contention is unsound.  Looking realistically at what was done and the object sought to be accomplished, the conclusion seems to be inescapable that petitioner and its partially owned subsidiary and affiliate merely entered into an agreement, oral at first but later reduced to writing the substance of which was that petitioner should transfer to First Bank all of its right, title, claim, and interest in the four banks in exchange for cash and an agreement to make "an equitable adjustment" through the payment of additional amounts if, fortuitously, future events should make any available for that purpose.

The view expressed above is borne out by the testimony of the officers of the contracting parties, by the various corporate resolutions, and by the contracts, especially the fifth one.  Thus the vice president of the acquiring corporation stated that he had commenced negotiations with petitioner's officers looking toward the acquisition of the four banks early in March of 1933.  Apparently all of the officers knew that the purchase of the stock of the four banks was not permitted under the law.  They therefore, on behalf of the respective corporations, entered into an oral agreement under which petitioner "furnished * * * [First Bank] proxies to vote the stock of [the four banks] to put them into liquidation and to sell

[1] ART. 37.  [Regulations 78.]  DISSOLUTIONS—RECOGNITION OF GAIN OR LOSS.

(a) *During Consolidated Return Period.*

Gain or loss shall not be recognized upon a distribution during a consolidated return period, by a member of an affiliated group to another member of such group, in cancellation or redemption of all or any portion of its stock; and any such distribution shall be considered an intercompany transaction.

the assets to * * * [First Bank] on a basis of loans and discounts at face, plus accrued, and bonds at market, plus accrued, bank premises at book value, cash at book value, and other assets at book.[2]" "After considerable negotiations" the terms of the fifth contract were agreed upon and all five of the contracts were then executed. This contract, according to the testimony of the witness, "was a part of the entire transaction in connection with the acquisition of those four banks"—"the result of our oral agreement that we would enter into some arrangement." When asked during cross-examination whether the sale was not actually made on April 18, 1933, he was quite positive in stating that it "was consummated prior to April 3rd. I will tell you that." His theory was—"under this old agreement that I mentioned we bought the tangible assets directly from the banks and ordered the banks * * * to open." The testimony of petitioner's vice president, who signed the contract in its behalf, was to substantially the same effect. He stated: "We wanted to get all that we could from these stocks in fairness to the stockholders." "We were naturally concerned as to getting prices from these assets which would return to the preferred stockholders particularly all of their investment, if possible." The signing of the five contracts was "a simultaneous operation"—"more or less of a simultaneous proposition" and the witness could not tell which was signed first and which was signed last.

The corporate resolutions of the four banks show that at the special meetings of the stockholders held in the directors' room of the First Bank on April 2, 1933, the president of the First Bank voted 475 of the 500 shares of outstanding stock of each bank. Each resolution authorized the transfer of the deposit liabilities of the bank and its good will to First Bank in consideration of the assumption of its liabilities. At least two of the banks were paid substantial amounts for their good will. In spite of this fact, however, when the fifth contract was prepared the recited consideration given for the making of the payments under it was "the good will, if any" of the four banks.

The treatment by the contracting parties of the payments under the contract supports the view that there was but one transaction. Without going into the bookkeeping details, most of which are shown in the stipulation, the payments were not treated as income by either of them. The First Bank treated them as amounts held for the benefit of petitioner. Petitioner, though showing the receipt of the amounts in its returns, treated them as nontaxable income, with the explanation: "Recoveries on losses not claimed on 1933 return."

---

[2] The transaction was thus summarized by the vice president of First Bank, who was also president of one of the four banks.

Whether this is tantamount to an admission that such loss as occurred was actually sustained in 1933 need not be decided.

As stated above, we are of the opinion that there was but one transaction, the substance of which was a sale of all of petitioner's interest in the four banks. Since this occurred between members of an affiliated group of corporations during a consolidated return period, it was an intercompany transaction in which no gain or loss can be recognized.[8] The form selected by the parties is immaterial. If all of the payments which the First Bank was required to make had been received by petitioner during 1933—if e.g. the fifth contract had merely provided for the payment to petitioner of the recoveries upon charged-off assets and branch profits realized in 1933—it could not seriously be contended that gain or loss should be recognized. The tax consequence is not changed simply because of the fact that a small portion (approximately 17 percent) of the payments were made during the years 1934 to 1938, inclusive. The deferred payments were an integral part of the transaction under which petitioner permitted its partially owned subsidiary and affiliate to acquire its wholly owned subsidiaries. The purpose of the payments was to minimize petitioner's loss on that transaction and not on one which took place between members of the affiliated group in 1937 or 1938 when consolidated returns were not required or filed.

From what has been said it is apparent we do not wholly agree with the views of either party. Inasmuch as the claimed capital loss resulted from an intercompany transaction between members of an affiliated group during 1933, it can not be allowed as a deduction in 1937. By a parity of reasoning the deferred payments did not constitute taxable income when received. We therefore hold that, while respondent committed no error in denying any capital loss deduction in 1937, he did err in including the payments received in 1937 and 1938 in petitioner's gross income for those years. Whether all or only part of these payments was accruable in 1937 becomes moot.

At the risk of unnecessarily extending this opinion, brief reference will be made to the case upon which petitioner places its chief reliance, *Dresser* v. *United States* (Ct. Cls.), 55 Fed. (2d) 499; certiorari denied, 287 U. S. 635. Under subdivision 3 and 4 of the court's opinion it discussed the taxpayer's claim for a deductible loss equivalent to the difference between the cost of some stock and the sum of (1) the amount received as a cash dividend in partial liquida-

[8] Article 33 of Regulations 78 provides that gain or loss may be recognized from the sale of stock or bonds during a consolidated return period "except in the case of a disposition (by sale, dissolution or otherwise) during a consolidated return period to another member of the affiliated group (see articles 31 and 37)." Article 31 states that "* * * gain or loss will not be recognized upon transactions between members of the group (referred to in these regulations as 'intercompany transactions')."

tion of the company and (2) the maximum amount which the taxpayer estimated at the end of the taxable year he would ultimately receive. The court applied the rationale of such cases as *Burnet* v. *Logan*, 283 U. S. 404; *Burnet* v. *Huff*, 288 U. S. 166, and kindred cases, though none of them was cited. It held that where a partial liquidating dividend had been received and it appeared to be reasonably certain that the stockholders would receive a further liquidating dividend, "a loss may not be allowed * * * until there is a distribution of such dividend in property or money." Cf. *Beekman Winthrop*, 36 B. T. A. 314; affd., 98 Fed. (2d) 74, and *Alvina Ludorff et al., Executrices*, 40 B. T. A. 32. Petitioner contends that that is what occurred here. Respondent urges that the cited case supports his view that the loss was sustained when there was a final distribution in liquidation, which, he insists, occurred in 1933 when petitioner received "cash and a contract."

The *Dresser* case is sound; but in our judgment it is not applicable under the facts presently before us. The liquidation of the four banks was incidental to the real transaction; and we are not particularly concerned with when it occurred. Our question is whether the transaction between the affiliates—the acquisition by the First Bank of the four banks—occurred in 1933. Since we are of the opinion that it did, no gain or loss may be recognized. That being so, it makes no difference that the precise amount of the loss could not then be ascertained. But if the time when the liquidation of the banks occurred is important, respondent seems to have the better of the argument; for there is no evidence indicating that the fifth contract was other than what it purports to be—a sale of the "good will, if any" of the four banks. It does not appear that the good will had any basis in petitioner's hands; so it would seem to follow that the amounts received would be includible in petitioner's gross income. This would be clearly inequitable; for the total amount received was substantially less than petitioner's investment in the four banks and no actual "gains, profit, and income" resulted. The view which we have taken, however, makes it unnecessary to consider petitioner's argument on this phase of the controversy.

*Issue II.*

No testimony was offered on this issue and the evidentiary findings are based entirely upon the stipulation of the parties. Respondent originally determined that the bonds were worthless prior to the taxable year. Upon brief, however, he insists that they were not worthless at the end of the taxable year, pointing out that they were sold in 1938 for approximately 8 per centum of their face amount. He relies upon the rationale of such cases as *Mayer Tank*

*Manufacturing Co.* v. *Commissioner*, 126 Fed. (2d) 588, and *Lehman* v. *Commissioner*, 129 Fed. (2d) 288, which apply the well settled rule that there must be, not a mere subjective ascertainment and charge-off, but actual worthlessness, and urges that conclusion should be reached petitioner sustained a capital loss in 1938 when it disposed of its bonds for $1,875.

The position taken by petitioner has also been somewhat vacillating. In its original petition it alleged that the "bonds were entirely worthless in 1937." In an amended petition, filed with leave of court since the hearing, it is alleged in the alternative that the "bonds were at least partially worthless in 1937 and the Commissioner should have allowed a partial bad debt deduction in an amount of at least $9,168.55." The amount claimed is the difference between the portion of the cost of the bonds not previously charged off and the aggregate ultimately paid upon them by the debtor.

The stipulated facts suggest petitioner may have been more interested in getting a ruling from the Department as to the year in which the remainder of its investment in the bonds could be charged off than it was in actually making an "ascertainment" of their worthlessness. Nevertheless we are of the opinion that it acted in entire good faith and endeavored to ascertain whether any amount might reasonably be expected to be recoverable. Petitioner does not contend that the understanding which its attorney assumed had been reached with representatives of the Department arose to the dignity of an agreement; so its effect may be passed.

The right answer is somewhat elusive. It is true, as respondent points out upon brief, that petitioner was a financial institution having ready access to financial services from which it could very easily have ascertained the market on the bonds; but market is "often highly unreliable" and, while sometimes accepted as a criterion of value, can not be accepted as proof of the amount which may ultimtely be recovered. *Lehman* v. *Commissioner*, *supra*; cf. *Ruth Wight Bill*, 38 B. T. A. 796, and cases cited; *Charles N. Spratt*, 43 B. T. A. 503, 514. It is also true that the amount ultimately paid upon the bonds might denote that petitioner was too pessimistic when it charged off all of its remaining investment in them. Absolute certainty, however, is not required; and the possibility of a small recovery should not deprive petitioner of its deduction if it acted in good faith. *Woods Lumber Co.*, 44 B. T. A. 88. The stipulated facts, as we have stated, indicate good faith upon petitioner's part; but the recovery of more than 8 per centum can hardly be said to be merely "nominal." Cf. *Carl P. Dennett*, 30 B. T. A. 49. This seems to be an insurmountable obstacle to the allowance of the entire amount claimed. What, then, should be done?

The alternative suggested by petitioner has much to recommend it. Subsequent events confirm—though we do not accept them as proof, cf. *Peyton du Pont Securities Co.* v. *Commissioner*, 66 Fed. (2d) 718—that the bonds were actually worth approximately 8 per centum of their face amount, or $2,000 at the end of the taxable year. They were transferred a few weeks later to an affiliated corporation for $1,875 and it ultimately collected the aggregate amount of $2,081.45. The market quotations appear to have reflected substantially the same value. We therefore conclude and find as a fact that the amount recoverable on the bonds at the end of the year 1937 was $2,081.45. The difference between that amount and petitioner's remaining investment in them was, in our judgment, properly ascertained by it to be worthless and charged off. We accordingly allow the deduction of $9,168.55 under section 23 (k) of the Revenue Act of 1936.

While we are content to rest our conclusion upon the basis set out above, it may also be supported under the rationale of *E. B. Elliott Co.*, 45 B. T. A. 82. The charge-off has been demonstrated by subsequent events to have been excessive. Inasmuch as the year in which it was made (1937) is still open, appropriate adjustment should be made to the net income for that year. This may require a corresponding adjustment to the income for 1938; but apparently it will merely increase petitioner's capital loss for that year which is already in excess of the amount allowable under section 117 (d) of the Revenue Act of 1936.

*Decision will be entered under Rule 50.*