**Andre MAXIMOV, as Trustee for the benefit of H. Robbin Fedden u/a dated 10/24/47, Plaintiff-Appellee,**

v.

**UNITED STATES of America,
Defendant-Appellant.**

**No. 118, Docket 26984.**

United States Court of Appeals
Second Circuit.

Argued Nov. 30, 1961.

Decided Feb. 14, 1962.

---

* Sitting by assignment.

Richard J. Medalie, Atty., Dept. of Justice, Washington, D. C. (Louis F. Oberdorfer, Asst. Atty. Gen., Meyer Rothwacks, Atty., Dept. of Justice, Washington, D. C., and Robert M. Morgenthau, U. S. Atty., S.D.N.Y., New York City, on the brief), for defendant-appellant.

William F. Suglia, of Hill, Betts, Yamaoka, Freehill & Longcope, New York City (John F. Lang, of Hill, Betts, Yamaoka, Freehill & Longcope, New York City, on the brief), for plaintiff-appellee.

Before CLARK, FRIENDLY, and KAUFMAN, Circuit Judges.

CLARK, Circuit Judge.

The taxpayer, Andre Maximov, is the successor trustee of an *inter vivos* trust created in 1947, under the laws of Connecticut, by H. Robbin Fedden. Under the terms of the trust instrument all income is to be paid to the grantor during his life; on his death the income is payable to his wife if she survives him and is still married to him. On her death if she qualifies for this life estate, or on the grantor's if she does not, the entire principal of the trust is to be paid to the surviving issue of the grantor in equal shares, *per stirpes*, with limitations not here relevant. At the time the trust was created, and at all times thereafter, the grantor-beneficiary and his wife and children have resided in England.

During its taxable years 1954 and 1955 the trust realized net long-term capital

gains from the sale of securities, resulting in tax liabilities of $53.10 and $1,316.32 respectively. Under Connecticut law these gains were retained as corpus.[1] Maximov, as trustee, filed federal fiduciary income tax returns for 1954 and 1955 with the District Director of Internal Revenue for Lower Manhattan reporting these gains, and paid the appropriate tax. Several years later, however, he filed a claim for refund of the tax on these two capital transactions, contending that as the gains were realized by a trust whose beneficiaries reside in the United Kingdom, they are exempt from United States tax under Article XIV of the Income Tax Convention between the United States and the United Kingdom, 60 Stat. (Part 2) 1377.

 Under United States tax law the trust is treated as a separate taxable entity. Freuler v. Helvering, 291 U.S. 35, 54 S.Ct. 308, 78 L.Ed. 634. Income received by the trust and not distributable to the beneficiaries, or not includable in the trust's distributable net income, is taxable to the trust. As the income involved here was neither distributable nor part of the distributable net income of the trust, Internal Revenue Code of 1954, § 643(a) (3), these gains are considered the income of the trust, taxable to it, and are not the income of the life tenant or the remaindermen.

The Convention grants an exemption from United States tax on gains from the sale or exchange of capital assets to residents of the United Kingdom not engaged in a trade or business within the United States. Article XIV, 60 Stat. (Part 2) 1384. Were the trust a "resident" of the United Kingdom, as such a resident is defined in the Convention, or were this income includable in the gross income of the grantor-beneficiary, who is a resident of the United Kingdom and not engaged in a trade or business here, the exemption would be clearly applicable. See T.D. 5569, 1947–2 Cum. Bull. 100, § 7.519(c). The difficulty which this case presents is that the trust is not a United Kingdom resident and the income here is treated in United States law as that of the trust.[2] Since the exemption of Article XIV explicitly applies only to *residents* of the United Kingdom, the taxpayer's claim can be sustained only if we disregard the separate tax treatment accorded trusts by United States law.

This is precisely what the taxpayer urges us to do. He asserts that the word "exempt" in Article XIV should be read as signifying a "release from economic burden," and that as the economic burden of the tax falls here on United Kingdom residents—the grantor-beneficiary and his family—the exemption must be read as applying in this case. In support of this contention the taxpayer maintains that one purpose of the tax convention was to achieve reciprocity of tax treatment for the nationals of the contracting parties. Thus, he argues, the aim of Article XIV was to secure for United Kingdom residents realizing capital gains in the United States precisely

---

1. Conn.Gen.Stat.Ann. § 45–112 (1958).

2. A resident of the United Kingdom is defined as "any person (other than a citizen of the United States or a United States corporation) who is resident in the United Kingdom for the purposes of United Kingdom tax and not resident in the United States for the purposes of United States tax." Art. II(1) (g), 60 Stat. (Part 2) 1378. That this definition applies to the trust is clear. Art. II(3), 60 Stat. (Part 2) 1379, states that terms not defined in the Convention shall have the meaning given them by the laws of the country which is applying the treaty to a question of domestic taxation. Since the word "person" is not defined in the treaty, it is necessary to resort to United States law to determine whether or not a trust is a "person." Under United States law, as under British law, the term "person" encompasses a trust. Internal Revenue Code of 1954, § 7701(a) (1), 26 U.S.C. § 7701(a) (1); Harvard Law School, World Tax Series, Taxation in the United Kingdom ¶¶5/3.1, 5/3.4, pp. 125, 127 (1957). Since this trust is resident within the United States for purposes of United States tax, it cannot be considered a resident of the United Kingdom.

the same treatment that a United States resident would be given on similar gains realized within the tax jurisdiction of the United Kingdom. Since the United Kingdom does not impose any income tax on profits it considers capital gains, and would not impose any tax on either an English trust or its beneficiaries, whether they were residents of the United States or the United Kingdom, it would, so the argument runs, defeat the manifest purposes of the Convention to deny the exemption here.[3] We must, it is therefore urged, ignore the United States rule that the trust is a separate entity, treat trust and beneficiary as one taxpayer, and allow as a deduction from the trust income the exemption granted the beneficiary by the Convention. In essence the contentions are threefold: that Article XIV was designed to achieve equality of tax treatment; that even though the parties did not explicitly provide for an exemption in this situation, the Convention must be read as if they did in order to further the objective of equality; and that this construction must be adopted, regardless of its impact on domestic tax policy.

■ As we are unable to find any explicit consideration of the issues thus raised in the language or background of the agreement, these contentions require a fundamental evaluation of the purposes and aims of the Convention. The basic aim of treaty interpretation is to ascertain the intent of the parties who have entered into agreement, in order to construe the document in a manner consistent with that intent. Rocca v. Thompson, 223 U.S. 317, 331–332, 32 S.Ct. 207, 56 L.Ed. 453; Restatement, The Foreign Relations Law of the United States § 129 (Tent.Draft No. 3, 1959). And to give the specific words of a treaty a meaning consistent with the genuine shared expectations of the contracting parties, it is necessary to examine not only the language, but the entire context of agreement. We must therefore examine all available evidence of the shared expectations of the parties to this Convention in order to answer the interrelated questions whether Article XIV was designed to achieve equality of tax treatment, and whether alterations of domestic tax law as are here proposed to realize such equality are themselves consistent with the intent of the contracting parties.

An examination of the full text of the Convention and the context of agreement indicates that, while one of the reasons Article XIV was included in the Convention was to achieve "equality" of tax treatment, imposition of a tax in the circumstances of this case would not be inconsistent with this objective. For the "equality" the parties strived for in this Article, as in similar provisions, was a limited one; they struck a rough bargain and were willing to tolerate marginal inequities of the sort involved in this case. While this dilutes the force of the taxpayer's argument, it alone might not require a denial of the exemption. But further principles must be considered. There is strong evidence that in the several Articles whose primary aim was to achieve substantial equality of tax treatment as between nationals of the contracting parties, the mutual concessions made were clearly delimited within the four corners of the instrument. Where it was necessary to make adjustments in domestic provisions in order to achieve the objectives of the Article, these were made explicitly. Thus to sanction freewheeling adjustment of domestic provisions to achieve point-by-point equality would be to risk undoing the bargain reached by the two nations. Finally, the Convention did not aim at achieving "equality" in a vacuum; the adjustments made equalizing tax treatment were made to achieve broader objectives of the treaty. Denial of the exemption here, while admittedly resulting in some inequality of tax treatment, will not affect those primary purposes.

Although Article XIV on its face is a one-way concession by the United States, it was designed to and does render the

---

3. For a discussion of United Kingdom taxation of capital gains, see note 4 infra.

tax treatment of United Kingdom residents realizing capital gains in the United States substantially equal to that of the United Kingdom. As we have said, it is reciprocal because the United Kingdom does not tax those profits it classifies as capital gains. But it does not achieve complete equality. In some ways the provision is more beneficial to the United States, for it exempts the gains of only those United Kingdom residents who are not engaged in a trade or business in the United States, while as a result of the United Kingdom policy of not taxing capital gains, a United States resident will be free of United Kingdom tax, regardless of whether he engages in a trade or business. On the other hand, the Convention sanctions the imposition of United Kingdom taxes in some instances where, as a result of Article XIV, a United Kingdom resident would be free of United States tax. For in many instances the United Kingdom does impose its standard tax on transactions which are considered to be the sale or exchange of capital assets under United States law, and in some cases this would result in "unequal" treatment.[4] For these reasons it cannot be said that, by including Article XIV in the Convention, the parties expected to establish wholly congruent tax treatment of capital gains realized by each other's residents.[5]

Scrutiny of the manner in which this and similar Articles were drafted reinforces the conclusion that whatever "equality" the contracting parties desired to achieve was clearly defined in the Convention. These Articles were drafted with technical precision; no room was left for further adjustments of domestic law. Article VI, 60 Stat. (Part 2) 1381, provides a clear example. In order to equalize the treatment of dividends—a difficult task because of the great difference in United States and United Kingdom concepts of the nature of corporate profits—complex adjustments were made in the rates and manner of taxing of both countries. The United States lowered its rates, while the United Kingdom granted an exemption from surtax. This Article did not achieve a complete equivalence of treatment; the result of the adjustments was to guarantee that the total tax burden imposed by each nation would be approximately the same. On close analysis Article XIV emerges as a similar technical adjustment. It is not a general exhortation to equality; it is addressed only to an exemption from United States tax, and is couched in the technical terminology of the Internal Revenue Code.[6]

4. It is commonly believed that Great Britain imposes no taxes on capital gains. This is true on a verbal level, and on a verbal level only. Comparative analysis of the two tax systems indicates that many functional transactions given capital-gains treatment in the United States are taxed as ordinary income in Great Britain. For example, gain on the sale of securities by an investment company is considered a capital gain in the United States and is taxed at the lower capital-gains rates. Internal Revenue Code of 1954, §§ 822, 832, 852. In the United Kingdom the same profits, far from being tax free, are treated as income and thus subject to the full standard tax. Northern Assurance Co. v. Russell, [1889] 2 T.C. 551 (U.K.). Other examples abound. Brudno & Hollman, The Taxation of Capital Gains in the United States and the United Kingdom, 1958 Brit.Tax Rev. 26, 134, passim.

5. Indeed, the Senate Committee which studied the Convention prior to ratification considered the possibility that, as a result of the disparity of capital-gain taxation between the countries, the United Kingdom resident would be at an advantage in some circumstances. Hearings on Executive D and E before a Subcommittee of the Committee on Foreign Relations of the United States Senate, 79th Cong., 1st Sess. 75 (1945). [Hereinafter cited as Hearings.]

6. The Convention was the result of a series of mutual concessions; there is evidence that Article XIV reflects a concession given by the United States in return for the counterconcession that the United Kingdom would co-operate in the exchange of tax information. Hearings, p. 62. Since the British policy of secrecy had stymied a prior attempt to negotiate a tax convention in 1937, id. at 56, it is clear that the bargain made was an important one.

Despite possible inequities which might arise from *United Kingdom* taxation of United States residents' gains, no provision was made for relief from United Kingdom tax.[7]

The broad aim of the Convention, as with income tax treaties generally, was to facilitate commercial enterprise between the two countries.[8] Specifically, the Convention was designed to avoid double taxation and prevent fiscal evasion.[9] The prime target was double taxation, which, because of the high rates of income taxation then and now prevailing in the two nations, constituted what the Secretary of State called "an undesirable impediment to international trade."[10] A primary motivation for inclusion of provisions equalizing tax treatment such as Article XIV was reduction of tax barriers to the free movement of individuals for commercial purposes.[11] And exemption here is unnecessary to achieve these ends. There can be no double taxation, since neither the beneficiary[12] nor the ultimate recipients of the corpus[13] will be taxable in the United Kingdom on these gains. Thus we cannot see that such an exemption would affect commercial intercourse between the two countries in any significant manner.

With this background we must examine the taxpayer's argument that "exempt" as used in Article XIV must be read as signifying a "release from economic burden." Of course the first difficulty with this argument is that it is wholly unclear that the entire economic burden of the tax will fall on United Kingdom residents. Since the tax constitutes a charge on the corpus, it will affect the present beneficiary only slightly by reducing the income; and it is difficult to say now that when the ultimate recipients of the corpus take, they will all be residents of the United Kingdom. As we have indicated, adoption of such a broad interpretation of Article XIV is unnecessary to further the objectives of the Convention, and is inconsistent with the manner in which this provision was drafted. In these circumstances we can see no reason to override the technical language of the Convention which, in conjunction with the Internal Revenue Code, as incorporated by Article II(3), recognizes the trust as a separate taxable entity.

 This is the interpretation of the Treasury Department taken in its original regulations issued in conjunction with the Convention. These regulations took the position that a nonresident alien beneficiary of a domestic trust was exempt from tax on capital gains accrued by the trust only in so far as the gains are in-

---

7. It is true, as the taxpayer points out, that some of the differences between the two systems will be further equalized by the application of Article III(2), 60 Stat. (Part 2) 1380, which exempts United States enterprises not engaged in trade or business in the United Kingdom from United Kingdom tax on industrial or commercial profits. Instead of weakening our conclusion, however, this section reinforces it. Since Article III (2) applies only to "enterprises," it does not create the across-the-board equality urged here. See Article II(1) (j), 60 Stat. (Part 2) 1379. Cf. Ehrenzweig & Koch, Income Tax Treaties § 211, p. 206 (1949). And the fact that Article III (2) will operate to eliminate some of the possible inequities created by Article XIV buttresses our conclusion that the latter Article was carefully drafted, and overrides domestic law only as explicitly specified.

8. Memorandum prepared for the Committee on Foreign Relations, United States Senate, Relative to Convention with Great Britain and Northern Ireland with Respect to Taxes on Income. Printed at Hearings, pp. 23, 27.

9. 60 Stat. (Part 2) 1377.

10. Hearings, p. 2. See also id. at 42.

11. Id. at 27.

12. See Jones v. Leeming, [1930] A.C. 415; Brudno & Hollman, The Taxation of Capital Gains in the United States and the United Kingdom, 1958 Brit. Tax Rev. 26, 42.

13. See Trustees of the Will of Brodie v. Commissioners of Inland Revenue, 17 T.C. 432, 438 (K.B.1933) (dictum). Cf. Harvard Law School, World Tax Series, Taxation in the United Kingdom ¶10/7.2, pp. 307–308 (1957).

cludable in his distributive share of the trust's income. T.D. 5569, 1947–2 Cum. Bull. 100, § 7.519(c). A similar position recognizing that the trust is a separate taxable entity for the purpose of determining treaty exemptions has been taken in the interpretation of all our tax conventions.[14] We hold that this is the correct interpretation of Article XIV of this Convention.

In so holding, we are not unmindful of the decision of the Ninth Circuit in American Trust Co. v. Smyth, 9 Cir., 247 F.2d 149, which held under similar circumstances that Article XIV created an exemption. This opinion, which was followed by the court below in this case, adopts the "economic burden" analysis.[15] For the reasons advanced above we believe that decision to be erroneous, and accept instead the reasoning of Judge Carter in the decision there reversed, American Trust Co. v. Smyth, D.C.N.D. Cal., 141 F.Supp. 414. See in accord with the view we are taking the Note, 71 Harv.L.Rev. 1163 (1958), though contra are Note, 9 Stan.L.Rev. 610 (1957), and Note, 33 N.Y.U.L.Rev. 233 (1958).

Reversed and remanded for the entry of judgment for the defendant.

14. E.g., Australia, T.D. 6108, Cum.Bull. 1954–2, 614, § 501.10; Austria, T.D. 6322, Cum.Bull. 1954–1, 132, § 516.8; Belgium, T.D. 6160, Cum.Bull. 1956–1, 815, § 504.119; France, T.D. 6273, Cum. Bull. 1956–1, 837, § 514.7; Switzerland, T.D. 6149, I.R.B. 1957–19, 42.

15. In American Trust Co. v. Smyth, 9 Cir., 247 F.2d 149, the Ninth Circuit also laid some stress on the fact that this Convention, unlike many United States Conventions with other countries, did not have a "savings clause." This clause allows the United States to impose a tax on all of its residents or citizens or domestic corporations "as though this Convention had not come into effect." E.g., Art. XIX(1) of the Convention with Norway, 62 Stat. (Part 2) 1764. Although the United Kingdom treaty does not have a clause precisely to this effect, the same limiting function is played by the definition of "resident of the United Kingdom" in Article II(1) (g), 60 Stat. (Part 2) 1378, which excludes citizens of the United States, United States corporations, and persons resident in the United States for the purpose of United States tax. Since only residents of the United Kingdom are granted any exemption from United States tax under the treaty, compare Articles III, VI, VII, VIII, IX, XI, XII, and XIV, this provision acts as a savings clause. Thus we ascribe no significance to the absence of such a clause from the United Kingdom Convention.