ESTATE OF CHARLOTTE H. BURGHARDT, DECEASED, RALPH KIMM, ANCILLARY ADMINISTRATOR, C.T.A., PETITIONER *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket No. 20766–81.     Filed April 11, 1983.

*Erik J. Stapper*, for the petitioner.
*Vincent R. Barrella*, for the respondent.

OPINION

TANNENWALD, *Chief Judge*: Respondent determined a deficiency of $4,983.11 in petitioner's Federal estate tax. The sole issue for decision is whether petitioner, the estate of a nonresident alien, is entitled, under the estate tax convention between the United States and the Republic of Italy (the Italian treaty),[1] to a percentage of the unified credit available

---

[1]The treaty's official title is "Convention Between the United States of America and the Italian Republic for the Avoidance of Double Taxation and the Prevention of Fiscal Evasion with Respect to Taxes on Estates and Inheritances." 7 U.S.T. (Part 3) 2977, T.I.A.S. No. 3678.

to estates of citizens or residents of the United States under section 2010[2] in lieu of the $3,600 credit allowed nonresident aliens under section 2102(c)(1).[3]

The case was submitted fully stipulated pursuant to Rule 122. The stipulation of facts and exhibits attached thereto are incorporated herein by this reference.

Petitioner is the Estate of Charlotte H. Burghardt (Burghardt) represented by its ancillary administrator, c.t.a., Ralph Kimm. At the time he filed the petition in this case, Ralph Kimm resided in Mawah, N.J. Burghardt died in Tscherms, Italy, on February 20, 1978; she was, at that time, for purposes of U.S. tax law, a nonresident alien (a nonresident not a citizen of the United States).[4] Burghardt's total gross estate wherever situated was $165,583.60,[5] of which $124,640 was located in the United States in an investment advisory account with Bankers Trust Co. in New York City.

On November 22, 1978, Bankers Trust Co., as a person in possession of property belonging to the decedent, filed a U.S. estate tax return. The return listed decedent's taxable estate at $118,882 but claimed no estate tax due by reason of the Italian treaty.

Respondent determined the tentative U.S. estate tax imposed by section 2101 to be $8,583.11. Petitioner concedes the tentative tax but contends that it is entitled, under the Italian treaty, to a credit in that amount.[6] Respondent argues that

---

[2]Unless otherwise indicated, all section references are to the Internal Revenue Code of 1954 as amended and in effect at the time of death, and all Rule references are to the Tax Court Rules of Practice and Procedure.

[3]When the Italian treaty was signed, sec. 2106(a)(3), the predecessor of sec. 2102(a), provided that the value of a nonresident alien's gross estate was "determined by deducting from the value of * * * his gross estate * * * [a]n exemption of $2,000." The amount of the exemption was increased to $30,000 by the Foreign Investors Tax Act of 1966, Pub. L. 89–809, sec. 108(e), 80 Stat. 1572.

[4]Burghardt was a citizen of Germany, where she was born, and a resident of Italy, having established her domicile in Merano, Italy, in 1964.

[5]The estate tax return filed for decedent listed total gross estate wherever situated at $154,026. Petitioner concedes, however, that the higher figure is correct.

[6]The credit nonresident aliens are entitled to under the treaty, petitioner contends, is determined by the following formula:

$$\frac{\text{Gross estate in the United States}}{\text{Total gross estate wherever situated}} \times \begin{array}{c}\text{Unified credit} \\ \text{pursuant to} \\ \text{sec. 2010}\end{array} = \begin{array}{c}\text{Tentative} \\ \text{credit}\end{array}$$

petitioner is limited to the $3,600 credit provided for nonresident aliens by section 2102(c)(1).[7] The question presented herein is one of first impression.

The Italian treaty, which became effective on October 26, 1956, is designed, according to its title, to prevent double taxation and avoid fiscal evasion. Article IV of the treaty provides nonresident aliens of the respective contracting States with a prorated "specific exemption" equal to a proportion of the "specific exemption which would be allowable under [the law of the taxing country] if the decedent had been domiciled in that state."[8] "Specific exemption" is not defined in the treaty. Paragraph 2 of article II of the treaty provides, however, that "any term not otherwise defined shall, unless the context otherwise requires, have the meaning which such term has under its own laws."

We must determine the meaning of the term "specific exemption."[9] Petitioner argues that the phrase "specific exemption" is a general term that describes the level at which estate taxation begins. Accordingly, petitioner contends that the phrase should be interpreted to include the unified credit established by the Tax Reform Act of 1976 to replace the exemption applicable to estates of citizens and residents of the United States. Respondent contends, on the other hand, that "specific exemption" is synonymous with the $60,000 estate

---

Based upon petitioner's contentions, the computation of the unified credit would be as follows:

$$\frac{\$124,640.00}{\$165,583.60} \times \$34,000 = \$25,592.87$$

This $25,592.87 amount would then be limited by the tentative tax of $8,583.11.

[7]Respondent's position on this issue was made public in Rev. Rul. 81–303, 1981–2 C.B. 255.

[8]The complete text of art. IV reads:

"The contracting State which imposes tax in the case of a decedent who at the time of his death was not a national of such State and was not domiciled in that State but was a national of or domiciled in the other State—

"(a) shall allow a specific exemption which would be allowable under its law if the decedent had been domiciled in that State in an amount not less than the proportion thereof which the value of the property subjected to its tax bears to the value of the property which would have been subjected to its tax if the decedent had been domiciled in that State; and

"(b) shall (except for the purposes of subparagraph (a) of this Article and for the purpose of any other proportionate allowance otherwise provided) take no account of property situated outside that State in determining the rate and the amount of tax."

[9]"Specific exemption" has been used in several estate tax treaties. According to Rev. Rul. 81–303, 1981–2 C.B. 255, provisions similar to art. IV of the Italian treaty are incorporated in treaties between the United States and six other countries—Australia, Finland, Greece, Japan, Norway, and Switzerland.

tax exemption allowed to estates of citizens and residents of the United States pursuant to section 2052, which was repealed by the Tax Reform Act of 1976.

To decide this case, we must examine the following questions. First, does the context of article IV of the Italian treaty require that we define "specific exemption" in any particular way? If not, what is the meaning of "specific exemption" under U.S. tax law? Finally, is the unified credit a "specific exemption" as that term is used in the Italian treaty? We turn first to article IV of the treaty.

The basic aim of treaty interpretation is to ascertain the intent of the parties. *Maximov v. United States*, 299 F.2d 565, 568 (2d Cir. 1962), affd. 373 U.S. 49 (1963). Courts must "give the specific words of a treaty a meaning consistent with the genuine shared expectations of the contracting parties." *Maximov v. United States, supra* at 568; *Johansson v. United States*, 336 F.2d 809, 813 (5th Cir. 1964). When treaties are ambiguous, they are to be construed "in a broad and liberal spirit, one which prefers the favoring of rights granted under it over a restrictive view of those rights." *Samann v. Commissioner*, 36 T.C. 1011, 1014–1015 (1961), affd. 313 F.2d 461 (4th Cir. 1963).[10]

Neither the Italian treaty nor the legislative history of its adoption defines "specific exemption." The Joint Committee on Internal Revenue Taxation, however, did provide the Senate Foreign Relations Committee with this analysis of article IV:

Under the Internal Revenue Code a specific exemption of $60,000 is allowed in cases of decedents who were citizens of or domiciled in the United States at the time of death, whereas an exemption of only $2,000 is allowed the estates of nonresident alien decedents. Article IV of the pending convention *liberalizes* the exemption allowable in the case of nonresident alien decedents by providing, in effect, that the estates of decedents not

[10]See also *Factor v. Laubenheimer*, 290 U.S. 276 (1933), in which the Supreme Court stated that—

"In choosing between conflicting interpretations of a treaty obligation, a narrow and restricted construction is to be avoided as not consonant with the principles deemed controlling in the interpretation of international agreements. Considerations which should govern the diplomatic relations between nations, and the good faith of treaties, as well, require that their obligations should be liberally construed so as to effect the apparent intention of the parties to secure equality and reciprocity between them. * * * [290 U.S. at 293.]"

nationals of nor domiciled in the taxing state shall be allowed an exemption not less than the proportion of the exemption allowed in the case of decedents domiciled in that state which the value of the property situated in the taxing state bears to the value of the property in the entire gross estate.

This article is similar to articles contained in conventions now in effect with Australia, Canada, Finland, France, Switzerland, Norway, and Greece. *The effect of this article is to exempt from the Federal estate tax those cases in which the gross estate of a nonresident alien does not exceed $60,000 and to provide a proportionately increased exemption in the case of a larger estate.* * * * [11] [S. Exec. Rept. 12, 84th Cong., 1st Sess. 8 (1955), reprinted in 3 Joint Comm. on Int. Rev. Tax., 87th Cong., 1st Sess., 3 Legislative History of United States Tax Conventions 3550 (1962) (hereinafter Legislative History).]

[Emphasis added.]

Respondent places great emphasis on the phrase "specific exemption of $60,000." He contends that this phrase is a direct reference to the predecessor of repealed section 2052 and that there can be "little doubt" that the negotiators of the Italian treaty "were employing that term in the context of its then current usage under United States law." Respondent's position thus appears to be that, since small estates were exempted from paying taxes through the mechanism of a deduction when the treaty was negotiated and since the Joint Committee referred to the amount of the deduction, the negotiators of the treaty intended that a deduction was to be the only method by which estates of nonresident aliens could be exempted from the U.S. estate tax. We do not agree. There is nothing inconsistent between the phrase "specific exemption of $60,000" and petitioner's position that "specific exemption" refers to the level at which estate taxation begins. We think that, by employing the phrase "specific exemption," the treaty negotiators did not mean to specify the particular mechanism by which small estates were to be exempted from paying tax (deduction versus some other method). Such a construction comports with the objective to "liberalize" the allowable exemption. Moreover, it is directly supported by the second sentence of the second paragraph of the Joint Committee's analysis, wherein the committee states that "The *effect* of this article is to exempt from the Federal estate tax those cases in

---

[11]The latter portion of the quoted language is obviously incorrect. The maximum allowable exemption would have been $60,000.

which the gross estate of a nonresident alien does not exceed [a certain dollar amount]." 3 Legislative History, *supra* at 3550. (Emphasis added.) See note 11 *supra*.

None of the other treaties which employ or employed either the phrase "specific exemption" or some other phrase which respondent believes to be the equivalent of it[12] or the legislative histories of any of them defines or discusses "specific exemption" in a manner inconsistent with the foregoing analysis. On the other hand, our analysis is directly supported by the history of the Canadian treaty.

Article V of the Canadian treaty, the first estate tax treaty entered into by the United States (in 1944) spoke, inter alia, in terms of a prorated "personal," rather than "specific," exemption.[13] When the treaty was modified in 1950 to provide for a proportionate "specific" exemption, the transmittal letter gave as the reason for the change *"so there will be no allowance of any part of the marital deduction."* S. Exec. Doc. S, 81st Cong., 2d Sess. 3 (1950), reprinted in 3 Legislative History, *supra* at 3099. (Emphasis added.) Thus, the term "specific exemption" was adopted, not to specify a particular deduction, but to differentiate the marital deduction from the method whereby small estates were exempted from the estate tax.[14]

---

[12]The Greek treaty allows a proportionate amount of "every abatement, exemption, deduction, or credit (except the marital deduction)." The Senate Foreign Relations Committee report reveals that one of the purposes of this provision was to liberalize the United States rule relating to the $2,000 specific exemption given the estates of nonresident aliens. S. Exec. Rept. 1, 82d Cong., 1st Sess. 6–7, reprinted in 1 Legislative History of United States Tax Conventions 590–591 (1962). Rev. Rul. 81–303, 1981–2 C.B. 255, asserts that the provision in the Greek treaty is similar to those provisions using the term "specific exemption" and that conclusions regarding the phrase "specific exemption" are equally applicable to the Greek treaty.

[13]The transmittal letter from Secretary of State Cordell Hull accompanying the proposed treaty stated that in accepting this provision, the United States was conforming to Canadian practice of allowing a "proportionate exemption." Canada, in turn, agreed to conform to the U.S. practice of determining the tax rate without taking into account the value of property outside the territory of the taxing government. S. Exec. Doc. G., 78th Cong., 2d Sess. 3 (1944), reprinted in 3 Legislative History, *supra* at 3057.

[14]Language employed in the French and Greek treaties also supports the distinction drawn between the marital deduction and the method by which small estates are exempted from paying tax. The French treaty permits nonresident aliens to utilize the marital deduction by allowing "every abatement, exemption, deduction, or credit," Convention and Supplementary Protocol between the United States of America and France, Treaties and Other International Acts Series (T.I.A.S.) 1982, at 10, reprinted in 1 Legislative History, *supra* at 1170; the Greek treaty denies the marital deduction by allowing "every abatement,

In view of the foregoing, we are satisfied that the context of article IV of the treaty permits us to read "specific exemption" in the broad sense to mean the method by which small estates are exempted from the estate tax.

We must still resolve the impact of paragraph 2 of article II of the Italian treaty, which mandates us to look at U.S. law with respect to the meaning of a term not otherwise defined in the treaty. See p. 707 *supra*. Respondent contends that we must define "specific exemption" narrowly because of the term's "well-established meaning" under U.S. tax law. Specifically, he argues that "specific exemption" has been, since 1942, synonymous with repealed section 2052 and/or its predecessor, section 935(c) of the Internal Revenue Code of 1939.

We note initially that neither the Internal Revenue Code nor the Treasury Regulations use the term "specific exemption" in the estate tax area. Although section 2521 of the Code as it existed prior to 1977 referred to a gift tax "specific exemption" (presumably to distinguish the $30,000 lifetime exemption from the $3,000 annual exclusion per donee), the term used in the estate tax area under repealed section 2052 was merely "exemption." For the reasons given below, we find "specific exemption" does not have, under U.S. tax law, the narrow meaning respondent suggests.

Respondent cites committee reports to the Revenue Act of 1942 using the phrase "specific exemption" which he claims "leave no doubt" that when the Italian treaty was negotiated, "specific exemption" was synonymous with section 935(c) of the Internal Revenue Code of 1939. All of the sentences respondent cites us to merely refer to "a" or "the" specific exemption and state the amount.[15] We cannot agree that

---

exemption, deduction, or credit" (except the marital deduction), Convention and Protocol between the United States of America and Greece, 5 U.S.T. (Part 1) 12, 25, T.I.A.S. No. 2901. See also S. Exec. Rept. 1, 82d Cong., 1st Sess. 7, reprinted in 1 Legislative History, *supra* at 591. For respondent's position as to why Greek nonresident aliens are not entitled, under the language of the treaty ("every * * * credit"), to a prorated unified credit, see Rev. Rul. 81–303, 1981–2 C.B. 255, 256. See also note 12 *supra*.

[15]Respondent's brief reads as follows:

Pertinent parts of the House Committee Report, H.R. Rep. No. 2333, 77th Cong., 1st Sess., 1942–2 C.B. 372, and Senate Committee Report, S. Rep. No. 1631, 77th Cong., 2d Sess., 1942–2 C.B. 504, are as follows:

1. SPECIFIC EXEMPTION AND INSURANCE<br>EXCLUSION COMBINED

The present law excludes from the gross estate of a decedent the first $40,000 of life insurance. In addition, a *specific exemption of $40,000* is allowed each estate regardless of whether the decedent had life insurance.

either these legislative references to "specific exemption" or subsequent legislative references to the same effect cited by respondent[16] illustrate any "well-established meaning" under U.S. tax law. None of the material respondent cites is used in a context that refutes petitioner's assertion that the term describes the level at which estate taxation begins. Indeed, the constant references to a dollar amount in the legislative material lend support to petitioner's assertion. Moreover, we think that the term was used in the 1942 committee reports

---

\* \* \* \* \* \* \*

The bill corrects this inequity by providing a *specific exemption* of $60,000 applicable to all estates regardless of whether life insurance is present. As a corollary, the $40,000 exclusion of insurance is repealed. (Emphasis Added) H.R. Rep. No. 2333, 1942–2 C.B. at 400–01.

### PROCEEDS OF LIFE INSURANCE

\* \* \* \* \* \* \*

The increase in the *specific exemption from $40,000 to $60,000* compensates in some measure for the discontinuance of the $40,000 exclusion. (Emphasis Added) H.R. Rep. No. 2333, 1942–2 C.B. at 417–418.

### SECTION 413. SPECIFIC EXEMPTION.

This section eliminates the life insurance exemption of $40,000 and increases the exemption for additional estate tax purposes from $40,000 to $60,000. (Emphasis Added) H.R. Rep. No. 2333, 1942–2 C.B. at 495.

### INSURANCE EXCLUSION FOR ESTATE TAX

Under the present law, there is excluded from the gross estate of a decedent the first $40,000 of life insurance. In addition, *a specific exemption of $40,000* is allowed to each estate regardless of whether the decedent had life insurance. The House bill, in lieu of these exemptions, granted *a specific exemption of $60,000* applicable to all estates regardless of whether life insurance was present. (Emphasis Added) S. Rep. No. 1631, 1942–2 C.B. at 549.

### SECTION 404. PROCEEDS OF LIFE INSURANCE

\* \* \* \* \* \* \*

the $40,000 exemption applicable under existing law to the latter class of proceeds, which was eliminated in the House bill, is restored in your committee bill, along with *the $40,000 specific exemption* under the additional estate tax, which had been replaced by a *$60,000 specific exemption* in section 413 of the House bill. (Emphasis Added) S. Rep. No. 1631, 1942–2 C.B. at 676.

Brief for respondent at 10–11.

[16]Respondent's citation to subsequent legislative references reads in full:

"Subsequent legislative references to the estate tax exemption under Repealed section 2052 as a "specific exemption," confirming that the terms are synonymous, are found in the committee reports to the Foreign Investors Tax Act of 1966, Pub. L. No. 89–809, and the legislative history of the Tax Reform Act of 1976, Pub. L. No. 94–455. *See,* H.R. Rep. No. 1450, 89th Cong., 2nd Sess., 1966–2 C.B. 967, 996; S. Rep. No. 1707, 89th Cong., 2nd Sess., 1966–2 C.B. 1059, 1093; Joint Committee Explanation Tax Reform Act of 1976, Pub. L. No. 94–455, 94th Cong., 2nd Sess., 1976–3 C.B. (Vol. 2) 13, 537, 542, 543; H.R. Rep. No. 94–1380, 94th Cong., 2nd Sess., 1976–3 C.B. (Vol. 2) 738, 744, 749."

Brief for respondent at 12 n. 4.

merely to distinguish the exemption establishing the floor below which estates are not subject to tax from the previously existing "life insurance exemption" which was abolished in the same act. Such a reading is consistent with the later actions of the Federal Government in its move to modify the Canadian treaty to distinguish the general "floor" exemption from the marital deduction. See pp. 709–710 *supra.*

From the inception of the estate tax in 1916 until 1977, the Code has referred to "exemption" rather than "specific exemption" in the estate tax area. We cannot find, as respondent urges, that under U.S. law "specific exemption" is synonymous with repealed section 2052. Instead, we find that "specific exemption" has been employed in U.S. tax law merely to describe the mechanism whereby small estates are excluded from the scope of the U.S. estate tax.

We must now decide whether the section 2010 unified credit, which establishes a credit against tax rather than a deduction from the estate and which can be applied against both the estate tax and the gift tax rather than against just the estate tax, is a "specific exemption" under the Italian treaty. Because both parties rely on the law of treaty modification in support of their contentions concerning this issue, we shall first review the effect of subsequent legislation on the vitality of a treaty.

It is well settled that a treaty may be modified by a subsequent act of Congress. *Moser v. United States,* 341 U.S. 41, 45 (1951); *Head Money Cases,* 112 U.S. 580, 599 (1884). It is equally true, however, that when a treaty and a statute relate to the same subject, courts will always attempt to construe them so as to give effect to both (*Whitney v. Robertson,* 124 U.S. 190, 194 (1888)), because "the intention to abrogate or modify a treaty is not to be lightly imputed to the Congress." *Menominee Tribe v. United States,* 391 U.S. 404, 413 (1968), quoting *Pigeon River Co. v. Cox Co.,* 291 U.S. 138, 160 (1934); see also *United States v. Payne,* 264 U.S. 446, 448 (1924). Bearing these rules in mind, we turn to the changes in estate taxation brought by the Tax Reform Act of 1976.

Petitioner and respondent agree that subsequent legislation does not modify an earlier treaty unless Congress' intent is clear. Respondent contends that the "unified credit" cannot be substituted for the "specific exemption" in the treaty because Congress did not intend to modify the treaty. This contention

is based on the theory, which we have already rejected, that "specific exemption" is synonymous with repealed section 2052. Petitioner contends, on the other hand, that the unified credit is a "specific exemption" because Congress did not intend to extinguish the treaty right to a prorated exemption. We agree with petitioner.

Respondent contends that the unified credit is not a "specific exemption" because repealed section 2052, which both parties agree was a "specific exemption," and section 2010's unified credit, "By their nature * * * have a dramatically different impact on an estate's ultimate tax liability."[17] Respondent points first to the fact that repealed section 2052 provided for a deduction from the gross estate, whereas the unified credit provides a dollar-for-dollar credit against the tentative tax due, and observes that, due to the progressivity of the estate tax, the unified credit is of more value to a smaller estate.

---

[17]Repealed sec. 2052 read as follows:

For purposes of the tax imposed by section 2001, the value of the taxable estate shall be determined by deducting from the value of the gross estate an exemption of $60,000.

In 1977, sec. 2010 read as follows:

(a) GENERAL RULE.—A credit of $47,000 shall be allowed to the estate of every decedent against the tax imposed by section 2001.

(b) PHASE-IN OF $47,000 CREDIT.—

| In the case of decedents dying in: | Subsection (a) shall be applied by substituting for "$47,000" the following amount: |
|---|---|
| 1977 | $30,000 |
| 1978 | 34,000 |
| 1979 | 38,000 |
| 1980 | 42,500 |

       \*      \*      \*      \*      \*      \*      \*

(d) LIMITATION BASED ON AMOUNT OF TAX.—The amount of the credit allowed by subsection (a) shall not exceed the amount of the tax imposed by section 2001.

For estates of decedents dying after Dec. 31, 1981, sec. 2010(a) and (b) reads as follows:

(a) GENERAL RULE.—A credit of $192,800 shall be allowed to the estate of every decedent against the tax imposed by section 2001.

(b) PHASE-IN OF CREDIT.—

| In the case of decedents dying in: | Subsection (a) shall be applied by substituting for "$192,800" the following amount: |
|---|---|
| 1982 | $62,800 |
| 1983 | 79,300 |
| 1984 | 96,300 |
| 1985 | 121,800 |
| 1986 | 155,800 |

Respondent also notes that the unified credit may be applied against both estate tax and gift tax liability whereas repealed section 2052's deduction was applicable only to the estate tax. Although respondent correctly describes the changes made by the 1976 Act, we are not convinced that Congress intended these changes to modify treaties employing the phrase "specific exemption."

The impetus behind the movement for estate tax reform in the early 1970's was the opposition to the broader impact, due to inflation, of the estate tax. H. Rept. 94–1380 (1976), 1976–3 C.B. (Vol. 3) 735, 749. This broader impact was viewed as inconsistent with the function of estate and gift taxes to restrain the undue accumulation of wealth and its transmission from generation to generation. Hearings on the General Subject of Federal Estate and Gift Taxes Before the House Comm. on Ways and Means, 94th Cong., 2d Sess. 1176 (1976) (House Hearings), Testimony of Charles M. Walker, Assistant Secretary for Tax Policy, Department of the Treasury. To remedy this situation, President Ford proposed increasing the estate tax exemption from $60,000 to $150,000. The President's Remarks of March 5, 1976, at Springfield, Ill., 12 Pres. Doc. 339 (1976). Senators Nelson and Packwood proposed, instead, that the estate tax deduction be replaced with a credit.[18] House Hearings, *supra* at 440. The credit, Senator Nelson explained, would be (1) more efficient and more equitable, because increases in the exemption reduce the progressivity of the tax structure and aid larger estates more than smaller ones, and (2) less costly to the Treasury. Hearings on H.R. 10612 Before the Senate Comm. on Finance, 94th Cong., 2d Sess. 35–36 (1976) (Senate Hearings), Colloquy between Senator Nelson and William E. Simon, Secretary of the Treasury. Subsequently, Charles M. Walker, Assistant Secretary of the Treasury for Tax Policy, testified that the Treasury "considered the *choice* between a credit and increasing the exemption and came down on the side of increasing the exemption." House Hearings, *supra* at 1200; emphasis added.

This statement indicating that the credit and the exemption

---

[18]Several others submitted proposals as well. See, e.g., Hearings on the General Subject of Federal Estate and Gift Taxes Before the House Comm. on Ways and Means, 94th Cong., 2d Sess. 433 (1976).

should be considered flip sides of the same coin is reinforced by the statement of Representative Al Ullman, Chairman of the House Ways and Means Committee, who stated, in an announcement regarding the estate and gift tax reform legislation which was to become the Tax Reform Act of 1976, that the bill "would provide a unified rate schedule for estate and gift taxes and *an increased specific exemption in the form of a credit* against the tax imposed." 122 Cong. Rec. 14270 (1976). (Emphasis added.) In the same vein, the House Ways and Means Committee discussed a credit in terms of an exemption equivalent and observed that the 1976 Act "provides a unified credit * * * in lieu of the specific exemptions provided under present law." H. Rept. 94–1380 (1976), 1976–3 C.B. (Vol. 3) 735, 749–750. Finally, as the Joint Comm. on Taxation observed in its General Explanation of the Tax Reform Act of 1976, 1976–3 C.B. (Vol. 2) 1, 24, "The Act increases from $60,000 to $175,000 *the level at which the taxation of estates begins.*" (Emphasis added.)

Respondent's argument that the unified credit cannot be a specific exemption under an estate tax treaty because the credit can be applied against gift tax as well as estate tax liability by residents of the United States is not persuasive. The dual tax system was replaced with a unified system to remove the incentive to make lifetime gifts. See statements by Prof. A. James Casner on behalf of the American Law Institute and Gerald R. Jantscher of the Brookings Institution, House Hearings, *supra* at 378, 1423. The unification was not designed, in and of itself, to have any effect on the amount of property that could be transferred free of tax; it only removed an incentive as to the timing. The treaty says that the United States shall allow nonresident aliens a percentage of the "specific exemption which would be allowable under its law if the decedent had been domiciled in [the United States]." Clearly, the full credit is "allowable" to one who has not made gifts that, but for the credit, would have been subject to taxation. Moreover, the fact that the unified credit may have additional functions beyond replacing the exemption does not, in and of itself, require us to conclude that the credit should not be considered as being encompassed within the term "specific exemption."

Respondent also contends, more so in Rev. Rul. 81–303,

1981–2 C.B. 255, than on brief, that legislation enacted since ratification of these treaties has removed the rationale for the prorated exemptions. Specifically, respondent observes that the exemption for estates of nonresident aliens rose from $2,000 to $30,000 in 1966 and to a $3,600 credit ($60,000 equivalent) in 1976. Notwithstanding the fact that one of the reasons given in 1966 for increasing the exemption was to "more closely equate" the taxation of estates of U.S. citizens and estates of nonresident aliens (S. Rept. 1707, 89th Cong., 2d Sess. (1966), 1966–2 C.B. 1059, 1093), we cannot find any intent on the part of Congress in so doing to abrogate any provision of the Italian treaty. See H. Rept. 1450, 89th Cong., 2d Sess. (1966), 1966–2 C.B. 967, 999; S. Rept. 1707, 89th Cong., 2d Sess. (1966), 1966–2 C.B. 1059, 1093. See also H. Rept. 94–1380 (1976), 1976–3 C.B. (Vol. 3) 735, 749-751. If respondent feels that the Italian treaty provides estate tax benefits that are no longer necessary or desirable, he can request that the proper officials seek to negotiate the appropriate changes.

The long and the short of this case is that the term "specific exemption," as used in the Italian treaty, should be construed as including the unified credit. To hold otherwise, as respondent would have us do, would read the "specific exemption" provision out of the Italian treaty; such a result would have the effect of placing nonresident aliens of the United States who are either nationals of, or domiciled in, Italy in the same category as any non-U.S. national domiciled in a foreign country with which the United States has no tax convention. Under these circumstances, one of the objectives of a tax convention, namely, to obtain an advantage for certain nationals of the parties to the convention, would be lost. Indeed, it appears that the treaty provision involved herein was designed to eliminate the discrimination which would otherwise exist against estates of nonresident citizens of the treaty country and in favor of the estates of citizens or residents of the United States. See the analysis of the Joint Comm. on Internal Revenue Taxation quoted on pp. 708–709 *supra*; R. Stephens, G. Maxfield & S. Lind, Federal Estate and Gift Taxation 7–17 (1978 ed.). If we were to sustain respondent's position, we would be reinstating such discriminatory treatment. Beyond this, a holding that unification, which was only intended to make the tax laws more equitable, abrogated certain provi-

sions of the Italian treaty would violate the maxim that treaties are to to be liberally construed (*Samann v. Commissioner*, 36 T.C. at 1014–1015), the maxim that the intention to modify a treaty is not to be lightly imputed to Congress (see, e.g., *Menominee Tribe v. United States*, 391 U.S. at 413), and the reasonable expectations of the parties. *Maximov v. United States*, 299 F.2d at 568.

We are unimpressed by respondent's argument that petitioner should be remitted to the statutory credit provided for in section 2102 because it is at least as beneficial to petitioner as the prior $60,000 exemption. The happenstance of a mathematical coincidence is irrelevant to the issue of the proper interpretation of the language of the treaty. To respondent's assertion that our interpretation mixes apples (the unified credit) and oranges (the specific exemption), we think the literary quote more appropriate to the issue involved herein is a "Rose is a rose is a rose is a rose." G. Stein, "Sacred Emily," Geography and Plays, p. 187 (1922).

*Decision will be entered for the petitioner.*